STATE OF MAINE                          SUPERIOR COURT
KENNEBEC SS.                            CIVIL ACTION
                                        DOCKET NO. CV-99-131
                                        DHM - KEN - 6/14/2001

STATE OF MAINE,              )
                            )
        Plaintiff            )
                            )
    v.                       )          DECISION AND ORDER
                            )
GERALD NELSON, JR.,          )
                            )
        Defendant            )
                            )

This matter is before the court on the State's complaint alleging violations of the

Unfair Trade Practices Act, 5 M.R.S.A. § 207 and the Consumer Solicitation Sales Act,

32 M.R.S.A. §§ 4661 et. seq. The plaintiff seeks injunctive relief[1], civil penalties for

intentional violations of the Unfair Trade Practices Act, restitution for consumers as well

as its costs including attorney's fees.

The defendant, Gerald Nelson, Jr. was notified of the trial date in this case and

failed to appear.

## FINDINGS OF FACT

In May of 1996, Gerald Mulvey, a Rhode Island resident received a letter in the

mail from Gerald Nelson. Nelson wrote Mulvey about his woodlot in Otisfield, Maine.

Nelson told Mulvey: "I have a small logging business and would like to do some

Selective Cutting on your land. I do very good work, and offer fair prices for the wood. I

see there is a lot of Selective Cutting that could be done to turn your lot into a healthy

forest." As a result of the letter, Mr. Mulvey and his wife called Nelson and arranged to

---

[1] Nelson agreed to the entry of a preliminary injunction in June 2000.

meet near the property to discuss the matter. In June of 1996 they met in Maine. At that meeting Nelson told them that he would pay them $1,500 per week from the harvest for ten weeks. The Mulveys made no decision at the meeting and returned to Rhode Island. Later that month, Nelson called and asked them if they had made a decision about the harvest. At that time the Mulveys agreed to permit Nelson to selectively harvest the wood on their Otisfield property. This agreement was verbal. There was no written contract.

The harvest began on the Mulvey property. On June 27, 1996, Mr. Mulvey called Nelson to arrange a meeting with him in Otisfield. Nelson agreed to meet with him on June 29, 1996. When Mr. Mulvey arrived, Nelson's equipment was on the lot, but Nelson did not arrive.

On July 1, 1996, Mr. Mulvey called Nelson's residence and spoke with Mrs. Nelson. Nelson returned his call that evening and told him that there was a check in the mail. On July 5, 1996, Mr. Mulvey had not yet received a check so he called Nelson and left a message on his answering machine. On July 6, 1996, Mr. Mulvey called Nelson and told him to stop cutting until he received a check. He arranged to meet with Nelson at the Otisfield property on July 8. When he arrived at the Otisfield lot in the early morning of July 8, 1996, Nelson's equipment was gone. Nelson never arrived for the meeting. Mr. Mulvey testified that he had slips establishing that Nelson harvested $19,498 worth of wood from his land. While Norris Willette, a wood broker, paid Gerald Nelson, Jr. $8,284.88 for wood harvested from a lot in Otisfield owned by "Gerard" from June 24 through 28, 1996. Mr. Mulvey has never received any payment for the wood Nelson harvested.

2

Laurian Sherman resides in Rockport, Maine and owns a woodlot in West Rockport. Gerald Nelson, Jr. contacted her and requested permission to harvest wood on her property. In September or October of 1996, Mr. and Mrs. Sherman met with Nelson at the property. She walked the lot with Nelson and told him that the land is adjacent to land owned by the local water company near Mirror Lake which is the drinking water supply. There are a number of streams on the property and Nelson told her he would not start cutting until the ground was frozen. Mrs. Sherman pointed out large hemlock trees that she did not want cut. Following the meeting, she expected Nelson to follow up with a specific proposal. In the meantime she hired a forester to create a management plan for the property.

In November of 1996 she learned that Nelson was harvesting her wood when she received a call from the water company and the Department of Environmental Protection informing her that the logging operation on her property was polluting Mirror Lake. She went to the property and saw that the large hemlocks, which she had asked Nelson not to cut, were gone. As a result of Mr. Nelson's conduct, Mrs. Sherman has suffered a loss in the ability to enjoy her land, and the land has decreased in marketability. The Shermans have spent $4,500 to remedy the damage caused by Nelson's logging operation. While the total value of wood taken from the property is unknown, Norris Willette paid Gerald Nelson, Jr. $3, 458.59 for wood owned by "Lorriann" near Mirror Lake. The Sherman's received one check for $600.

Harry Harden is a New Hampshire resident. He owns a woodlot in Damariscotta, Maine. In February of 1998, he received a letter from Gerald Nelson, Jr. in which Nelson offered to selectively harvest his woodlot to "improve the quality of [your] land for the

3

future." Nelson also stated that he offered fair prices for the wood. Mr. Harden responded to Nelson by writing him and asking which of his properties in Damariscotta Nelson proposed to harvest. Mr. Harden then received a phone call from Nelson in early March of 1998. They discussed the wood harvest and agreed to meet at the property in Maine on March 5, 1998 to discuss it further.

Mr. Harden then called a friend who is an attorney and who resides in Damariscotta. This friend told Mr. Harden that he had had a client who had sued Mr. Nelson. After receiving this information, Mr. Harden called Nelson to cancel the March 5, 1998 meeting. He was surprised the next week to receive a check from Nelson for $1,535. He never gave Nelson permission to harvest any wood. Mr. Harden did not cash the check. He contacted the authorities. Robbins Lumber, Inc. paid Gerald Nelson, Jr. $8,661.96 for wood harvested on March 3 through 5, 1998 from a woodlot in Lincoln County owned by Harden. Mr. Harden has never been compensated for the wood harvested from his property.

Janice Bartlett lives in Topsham, Maine. Her family owns a woodlot in Topsham near her home. She received a letter from Nelson offering "to do some Selective Cutting" on the lot and to pay "fair prices for the wood." The family discussed the possibility of having the lot harvested. She had several phone calls with Nelson and he and his wife met with her at her home. She walked the lot with him. He told her that he would selectively cut the lot and that he would remove damaged trees. He emphasized that her lot would look like a state part when he was done. He also told her that she would be paid $40,000 to $50,000 for the wood. She asked for references and checked them. Nothing aroused her suspicions. She entered into a written contract for the harvest of the

wood in December of 1998. Nelson began the harvest in early 1999. Mrs. Bartlett visited the lot often and asked why it did not look like a state park. Nelson harvested many more trees that she had understood would be the case. In the summer of 1999 she received a notice that Nelson had filed for bankruptcy. This news, along with the extensive cutting, upset Mrs. Bartlett. In September of 1999 she terminated the harvesting operation.

Also in September of 1999, Merle Ring, who is a licensed forester employed by the Maine Forest Service, toured the Bartlett lot. Mr. Ring, along with a team of forest rangers, performed a stump cruise of the lot in October 1999. He calculated the volumes of wood taken by species, product and value. Using the 1998 average stumpage prices for Sagadahóc County as published by the Maine Forest Service, he conservatively calculated that the landowner should have received $24,768 in stumpage money for the wood taken. However, under the terms of the contract Nelson agreed to pay Mrs. Bartlett between $40,000 and $50,000. She received a total of $14,000.

Richard Marsden received a letter from Gerald Nelson, Jr. in which Nelson offered to selectively harvest his woodlot in Swanville, Maine. At the time, Mr. Marsden lived in Massachusetts. Subsequently, Mr. Marsden moved to Maine. He received a second letter from Nelson in which Nelson expressed an interest in performing a "selective cut" and stated that trees damaged by the ice storm of 1998 should be removed. Marsden agreed and entered into a contract with Nelson in March of 1999. The harvest was conducted from March through August of 1999. Mr. Marsden did not receive payment for the wood that was being harvested. He stopped the harvest in August and hired Mr. William Calderwood, a licensed forester to assess the lot. Mr. Calderwood

5

performed a stump tally. He opined that based upon the species and size of trees cut, the objective of the harvest was to remove the largest and most valuable trees. This type of harvest is typically called "high-grading." Mr. Calderwood ascertained from his observation of the harvest that it was unlikely that the pine trees, which accounts for most of the value and volume removed from the Marsden lot, suffered serious damage in the ice storm.

Mr. Calderwood determined that the wood harvested from Mr. Marsden's lot is worth $614 pursuant to the contract prices offered by Nelson. The wood is conservatively worth $2,898 according to the most recent stumpage prices maintained by the Maine Forest Service. Mr. Marsden received a check for $263 from Nelson.

Gary Baker resides in Kentucky. He owns a woodlot in Augusta, Maine. He works in the paper industry and travels to Maine often. In August of 1999, he received a letter from Gerald Nelson. Mr. Baker's oldest daughter had started college that fall so he felt that he could use the money from a wood harvest. He sent Nelson an email and spoke with him on the phone. He asked Nelson to give him an estimate of the amount that he would receive in stumpage. Nelson assured Baker that Baker would receive $17,000 for the stumpage.

Understanding that the harvest would be selective, taking only 40% of the mature trees and that he would receive $17,000, Baker entered into a contract with Nelson for the harvest of his woodlot in September of 1999. Baker learned that the harvest had begun when he received a call from a neighboring landowner. The harvest began in December of 1999. In January of 2000, Mr. Baker was in Maine on business so he called Nelson. Nelson met with him and gave him a check for $2,700. Nelson assured Mr. Baker that

6

more checks would be coming. However, Mr. Baker never received another check from Nelson. He called him numerous times. On two occasions Nelson agreed to meet Mr. Baker in Maine to pay him for the wood. Nelson did not appear at either meeting.

Patty Cormier, a licensed forester employed by the Maine Forest Service performed a stump cruise of the Baker property. She determined that the average volume of harvested forest products for the lot is 400 cords, and the average value is $17,306.

Wesley Lewis lives in Whitman, Massachusetts. He owns a woodlot in Harrison, Maine. Mr. Lewis received a letter from Nelson offering to selectively cut his wood and to pay a reasonable price for the wood. Mr. Lewis thought that Nelson was going to improve the woodlot. Nelson harvested the woodlot in the fall of 1999. Nelson made a mess on the lot, spilling fuel and destroying road improvements, which upset Mr. Lewis.

Forester Merle Ring performed a stump cruise of the lot. Mr. Lewis' lot had a considerable amount of oak veneer on it which is a particularly high value wood. Based on the cruise and using values from the most recent state published stumpage price list and log and veneer specs and prices from Bear Paw Lumber Company, where some of the logs were taken, Mr. Ring estimated that the value of the sawlogs and pulp taken from the Lewis lot to be $24,841.00. He further estimated that the oak veneer taken from lot is worth $5,089.00, for a total of $29,930.00. Mr. Lewis' driveway was also destroyed as a result of Mr. Nelson's activities at a cost of $3,000. Mr. Lewis was paid $2,171.

Gerald Nelson, Jr. contacted Brenda Koukol of Plainville, Massachusetts about harvesting a woodlot that she owns in Harrison, Maine. Nelson told her that she would be paid $9,000 from the harvest. She requested that he provide references. He provided references and she agreed verbally to let the harvest begin in April of 2000. After the

harvest was underway for a couple of weeks, Ms. Koukol tried to contact Nelson to find out where her payment was. He was unresponsive. She told him to stop cutting. Merle Ring later performed a stump cruise of the valuable white pine lot and conservatively estimated the harvest to be worth $5,813. Nelson sent Ms. Koukol one check for $1,112.

In the summer of 2000, Don Atkinson of Portland received a letter from Nelson offering to selectively cut trees on a woodlot owned by his father in Skowhegan. Mr. Atkinson's father had to go into a nursing home. Mr. Atkinson has power of attorney for his father. Nelson promised to pay Mr. Atkinson $3,200 for his father's wood. Mr. Atkinson also told Nelson that he did not want the lot to be clear-cut and that he understood that Nelson would be responsible for cleaning up the lot. Nelson harvested the lot. He never paid Mr. Atkinson and did not clean up the lot. Mr. Atkinson called Nelson more than 75 times, but Nelson never returned his calls.

Warren Evans lives in Windham, Maine. He also owns land in Sumner, Maine. In July of 2000 he received a letter from Nelson who expressed an interest in selectively harvesting the lot in Sumner. Mr. Evans did not want the Sumner lot harvested. In response to the letter, Mr. Evans emailed a message to Nelson telling him that he was not interested in having the Sumner lot harvested but that he did need some trees cut on his Windham land. Nelson told Mr. Evans that he preferred to work without a written contract. Mr. Evans prepared an outline of his understanding of what Nelson would be harvesting. The outline specified that Nelson was to remove certain trees along with the stumps. In return Nelson was to be allowed to take five loads of timber from the property.

8

Nelson did not remove the stumps and he kept removing loads of timber. Mr. Evans questioned Nelson about how much wood he was cutting. Nelson told him not to worry that he would be paid $12,000 to $15,000. When his disregard for the terms of the agreement became clear, Mr. Evans became nervous. Nelson cut pines in violation of the 75-foot setback requirements from the river and he damaged power lines. Mr. Evans asked for Nelson's insurance information. He contacted the insurance company and was told that the policy did not cover damages to landowner's property by Nelson's logging operation. Mr. Evans asked Nelson to leave the property. Nelson did not leave. He kept cutting wood. Mr. Evans called the police. After the police arrived Nelson eventually left. Mr. Evans was never paid by Nelson. In fact, Mr. Evans had to hire third parties at higher prices to clean up the mess made by Nelson, and to refurbish damage to his road and lawn. Mr. Evans was paid $6,000 for wood removed from his property.

Michael Hic-Quinn lives in Portland, Maine and owns a woodlot in Augusta. He has made several improvements including a pond which he stocks with fish. Nelson contacted him about harvesting wood from the lot. Nelson promised to pay him every week. In January 2001 Mr. Hic-Quinn entered into a written contract with Nelson for a harvest of the woodlot. This agreement came after Nelson agreed to a preliminary injunction in June of 2000. Yet the terms of this agreement alone violate paragraphs 1, 2, 3, & 5 of the injunction. Subsequently, the lot was harvested in the winter of 2001. Mr. Hic-Quinn testified that the wood taken from his land was worth at least $20,000. Mr. Hic-Quin also suffered an unspecified amount of damage to his property and landscape as a result of Nelson's activities. He has never received any payment.

# CONCLUSIONS OF LAW

Two general issues are presented to the court. First, has the defendant engaged in unfair and deceptive trade practices and second, has he violated the Consumer Solicitations Sales Act.

The Unfair Trade Practices Act, 5 M.R.S.A. § 207 provides that unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are declared unlawful. Gerald Nelson, Jr. hass engaged in trade and commerce by promoting and offering his services as a logger. In construing the Act, this court must be guided by the interpretations given by the Federal Trade Commission and the Federal Courts to section 5(a)(1) of the Federal Trade Commission Act (15 U.S.C. § 45(a)(1)). See 5 M.R.S.A. § 207(1). A practice is deceptive if it has the tendency or capacity to deceive consumers acting reasonably under the circumstances about a material fact. See generally Federal Trade Commission Policy Statement on Deception, appended to Cliffdale Associates, 103 FTC 110, 174, et seq. (1984).

Gerald Nelson deceived every consumer in this case about two material facts. First, he misrepresented the nature and the extent of the harvest that he conducted. In each case he told the consumer that he would selectively harvest the wood. Every consumer understood this to mean that he would take some but not all of the trees in a manner that would preserve the ability to perform another harvest in the future. In each case the consumer relied on this understanding when he or she agreed to allow the harvest. Also in every instance Nelson did not selectively harvest the lot in accordance with the landowner's understanding. He performed a high-grade harvest taking more wood than he said he would take and in some instances taking trees that he was

10

specifically told not to take. Every consumer testified that the selective nature of the harvest was material to his or her decision to go forward with the harvest.

Second, Gerald Nelson deceived every landowner with respect to the price he would pay for the wood. He promised everyone "fair" or "reasonable" payment. He promised some of the landowners specific dollar amounts. In many instances, Gerald Nelson, Jr. paid nothing. In other instances, he made nominal payments that were far less than the fair value of the wood.

The consumers acted reasonably. They all met with Nelson or had conversations with him prior to entering into the agreement. He was prompt and responsive to every customer contact prior to commencing the harvest. Many consumers had written contracts. Two landowners, Harry Harden and Laurian Sherman never even consented to have Nelson cut their wood.

Nelson intentionally deceived the landowners by promising them selective harvest and fair payment, neither of which he delivered. He engaged in this practice from at least 1996 through 2001, even after he consented to the entry of a preliminary injunction enjoining such practices. After he harvested the wood, he avoided consumers who called to ask about payment. He did not answer his phone. He did not return messages. He did not show up at prearranged meetings with landowners.

Gerald Nelson, Jr. has also violated the Consumer Solicitations Sales Act, 32 M.R.S.A. § 4661 through 4670. Pursuant to this Act:

> Where merchandise is sold or contracted to be sold, whether under a single contract or under multiple contracts, to a consumer as a result of or in connection with a salesman's direct contact accomplished by means of and including, but not limited to, a personal visit or a telephone call upon the consumer, other than at the seller's place of business, without the consumer soliciting the initial contact, the contract shall be in writing, bear

11

the signature of the seller and the consumer, contain the date of the transaction, the terms of the sale or offer, the name and the mailing address of the seller's permanent place of business, a statement of the consumer's right to avoid as provided in this subchapter

32 M.R.S.A. § 4662. Sections 4663 and 4664 require the seller to notify the consumer in writing of his right to cancel the contract by providing written notice of avoidance to the seller within three full business days following the day on which the contract was made. "Merchandise" is defined to include services for purposes of this statute. 32 M.R.S.A. § 4661(2).

Gerald Nelson Jr. contacted all of the eleven consumers by sending a letter offering his services. He met with the consumers who responded to the mail at the consumers' homes. None of the consumers initiated contact with Nelson at his place of business. All of the consumers were solicited by mail and by personal visit at their homes or woodlots which is not Nelson's usual place of business. Some consumers were not given a written contract. Those consumers that had written contracts did not have a three-day right to cancel. Violations of the Consumer Solicitations Sales Act constitute violations of the Unfair Trade Practices Act. 32 M.R.S.A. § 4670.

Upon finding violations of the Unfair Trade Practices Act, the court has considerable discretion to fashion appropriate remedies to do complete justice. State v. Bob Chambers Ford, 522 A. 2d 362, 366 (1987). Section 209 of the Unfair Trade Practices Act provides for restitution for consumers harmed by defendant's unlawful practices and a $10,000 civil penalty for each intentional violation of the Act. The Court finds eleven intentional violations of the Act and accordingly imposes a civil penalty of $10,000 per each, for a total civil penalty of $110,000.

12

The court also orders restitution to consumers as follows:

| | | |
|---|---|---|
| 1. | Gerald Mulvey | $19,498 |
| 2. | Laurian Sherman | $7,958 |
| 3. | Harry Harden | $8,662 |
| 4. | Janice Bartlett | $26,000 |
| 5. | Richard Marsden | $2,635 |
| 6. | Gary Baker | $14,300 |
| 7. | Wesley Lewis | $30,219 |
| 8. | Brenda Koukol | $7,888 |
| 9. | Don Atkinson | $3,200 |
| 10. | Warren Evans | $6,000 |
| 11. | Michael Hic-Quinn | $20,000 |

The court believes that permanent injunctive relief is also necessary.

1. Gerald Nelson, Jr., his agents, servants, officers, employees, and attorneys, and those persons in active concert or participation with him who receive actual notice of this Order are permanently enjoined from:

(a) engaging in or pursuing any home solicitation sales; and

(b) making any direct contact with customers or potential customers at any place other than at Gerald Nelson Jr.'s permanent place of business, as defined by the Consumer Solicitation Sales Act 32 §4661(2-A), without the customer or potential customer soliciting the initial contact independently from any actions taken by Gerald Nelson Jr.; and

(c) the use of any business name without first notifying the Department of the Attorney General; and

(d) entering into any agreements to provide any wood harvesting services without first creating a written contract containing each of the provisions listed herein. Any agreement that does not conform to the content, disclosure and procedure requirements herein shall be void; and

(e) making any oral or written representations to woodlot owners that mislead or confuse customers as to their unconditional right to avoid any contract entered into; and

(f) making any oral or written representations to woodlot owners that mislead or confuse customers as to the nature and extent of the harvest to be performed, or the value of the wood to be harvested and the amount to be paid for the wood harvested in violation of the Unfair Trade Practices Act, 5. M.R.S.A. § 207; and

(g) beginning performance of any such contract for the harvesting of wood so long as the customer has a right to cancel or avoid. At a minimum, performance of any wood harvesting contract shall not begin until a period of three full business days after the date upon which the contract was agreed to has expired.

2. Gerald Nelson, Jr., his agents, servants, officers, employees, and attorneys, and those persons in active concert or participation with him who receive actual notice of

14

this Order must obtain a written contract for any and all wood harvesting services, prior to harvesting, which meets the following requirements:

(a) any written contract created pursuant to this Order must contain a clear and conspicuous disclosure that states:

> LICENSED FORESTERS ARE AVAILABLE FOR HIRE TO ASSESS YOUR WOODLOT FOR HARVESTING. YOU CAN OBTAIN A LIST OF LICENSED FORESTERS AND THE MOST RECENT STUMPAGE PRICES BY CONTACTING THE MAINE FOREST SERVICE AT STATE HOUSE STATION #22, AUGUSTA, MAINE 04333 (207) 287-2791 OR INSTATE 1-800-367-0223; and

(b) any written contract created pursuant to this Order must contain a clear and conspicuous disclosure that states:

> GERALD NELSON JR. HAS BEEN FOUND BY A COURT OF LAW TO HAVE VIOLATED THE MAINE UNFAIR TRADE PRACTICES ACT AND THE CONSUMER SOLICITATION SALES ACT BY ENGAGING IN DECEPTIVE, AND FRAUDULENT BUSINESS PRACTICES PURSUANT TO 5 M.R.S.A. § 207 AND 32 M.R.S.A. §§ 4661-4671. A CONSUMER LAW GUIDE IS AVAILABLE FROM THE STATE OF MAINE, DEPARTMENT OF ATTORNEY GENERAL BY CALLING (207) 626-8849; and

(c) any written contract created pursuant to this Order must clearly and conspicuously state:

> YOU MAY AVOID THIS CONTRACT BY GIVING WRITTEN NOTICE OF AVOIDANCE TO GERALD NELSON, JR. BY ORDINARY MAIL, POSTAGE PREPAID, WITHIN 3 (THREE) FULL BUSINESS DAYS FOLLOWING THE DAY THE CONTRACT WAS MADE. NOTICE TO GERALD NELSON JR. OF AVOIDANCE IS EFFECTIVE UPON DEPOSIT IN THE UNITED STATES MAIL; and

(d) any written contract created pursuant to this Order must contain the following clear and conspicuous statement, as well as the landowner's signature attesting that:

> **I HAVE READ AND UNDERSTAND THAT GERALD NELSON JR. HAS VIOLATED THE MAINE UNFAIR TRADE PRACTICES ACT AS WELL AS THE CONSUMER SOLICITATION SALES ACT BECAUSE OF HIS WOODLOT HARVESTING PRACTICES. I UNDERSTAND THAT THE PRICE I WILL BE PAID FOR ANY WOOD HARVESTED FROM MY LAND WILL BE EQUAL TO OR GREATER THAN THE STUMPAGE PRICE SET IN THE MAINE FOREST SERVICE STUMPAGE PRICE GUIDE FOR THE AREA IN WHICH MY WOODLOT LIES. I ALSO UNDERSTAND MY RIGHT TO AVOID THIS CONTRACT PURSUANT TO THE TERMS STATED HEREIN.**

The disclosures required by this Order are "clear and conspicuous" so long as they appear in fourteen point boldface type.

3. Gerald Nelson, Jr., his agents, servants, officers, employees, and attorneys, and those persons in active concert or participation with him who receive actual notice of this Order are further required to:

(a) set all contract prices for any woodlot harvesting services at a value equal to or greater than the prices contained in the most recent Maine Forest Service stumpage price guide for the area in which the landowner's woodlot lies; and

(b) provide customers with an accounting of all wood harvested from their woodlot, which shall include accurate and true scale slips for the wood harvested as well as a copy of the most recent Maine Forrest Service stumpage price guide for the area and type of wood harvested; and

(c) retain a copy of each written contract and all written disclosures made to woodlot owners with whom he contracts to harvest wood for a period of three years, and to make these records available for examination by the Department of the Attorney General upon request.

This Order is effective.

Date: _Jan 18 2007_

_____
JUSTICE, Maine Superior Court

17

Date Filed __6/18/99__ ____Kennebec____ Docket No. __CV99-131__
                              County

Action ___Unfair Trade Practices___

# J. MARDEN

State of Maine                        vs.   Gerald Nelson, Jr.

| Plaintiff's Attorney | Defendant's Attorney |
|---|---|
| Linda J. Conti,AAG<br>State House Station #6<br>Augusta, Maine 04333 | XXXXXXXXXXXXXXXXXXXXX Donald Gasink, Esq.<br>XXXXXXXXXXXXXXXX 82 Winthrop St.<br>XXXXXXXXXXXXX Augusta Maine 0433†<br>XXXXXXXXXXXXXXXXXX<br>Gerald Nelson, Jr.  (9/23/99)<br>145 Smithton Road   PO BOX 4<br>Freedom, Maine 04941 |

| Date of Entry | |
|---|---|
| 6/18/99 | Complaint, filed. s/Conti, AAG<br>Case File Notice mailed to atty. |
| 7/23/99 | Copy of summons with return service on Gerald Nelson,Jr filed.<br>s/Conti,AAG |
| 9/23/99 | Answer, filed. s/Nelson, Pro Se<br>SCHEDULING ORDER, Marden, J.<br>"Scheduling Order filed. Discovery deadline is May 23, 2000<br>Copies mailed to parties of record. |
| 11/22/99 | Copy of Bankruptcy Order, filed.<br>Letter from Linda Conti, AAG. requesting conference with court on clari-<br>fication of designation of expers. |
| 11/24/99 | Conference call set for 12/2/99 at 1:00 p.m.  Call to be initiated by Linda<br>Conti, AAG. |
| 12/2/99 | Telephone Conference Record, filed. Hon. Kirk Studstrup Presiding.<br>Linda Conti, AAG. and Donald Gasink, Esq. participating in conference call.<br><br>The entry will be:<br>The plaintiff may designate and call fact/expert witnesses different forest<br>rangers depending on which ranger investigated and assessed each woodlot in<br>question. |
| 12/22/99 | Notification of Discovery Service, filed. s/Conti, AAG<br>Plaintiff's Expert Designation served on Gerald Nelson, Jr., and Donald<br>J. Gasink, Esq. on 12/22/99<br><br>Exhibits in notebook and Exhibit 1 are in the vault. |
| 3/10/00 | The States request for an order dispensing with service of subpoena for<br>bank records upon the customer with incorporated memorandum of law filed.<br>s/Conti AAG<br>Affidavit of detective Richard O Fairfield Jr filed.<br>Proposed order filed. |